# EXHIBIT D

| 112TH CONGRESS<br>*2d Session* | **COMMITTEE PRINT** | S. PRT.<br>112–38 |
| --- | --- | --- |

# STAFF REPORT ON MEDTRONIC'S INFLUENCE ON INFUSE CLINICAL STUDIES

————————

PREPARED BY THE STAFF OF THE

## COMMITTEE ON FINANCE
## UNITED STATES SENATE



OCTOBER 2012

Printed for the use of the Committee on Finance

————————

U.S. GOVERNMENT PRINTING OFFICE

76–091                    WASHINGTON : 2006

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON FINANCE

MAX BAUCUS, Montana, *Chairman*

| | |
|---|---|
| JOHN D. ROCKEFELLER IV, West Virginia | ORRIN G. HATCH, Utah |
| KENT CONRAD, North Dakota | CHUCK GRASSLEY, Iowa |
| JEFF BINGAMAN, New Mexico | OLYMPIA J. SNOWE, Maine |
| JOHN F. KERRY, Massachusetts | JON KYL, Arizona |
| RON WYDEN, Oregon | MIKE CRAPO, Idaho |
| CHARLES E. SCHUMER, New York | PAT ROBERTS, Kansas |
| DEBBIE STABENOW, Michigan | MICHAEL B. ENZI, Wyoming |
| MARIA CANTWELL, Washington | JOHN CORNYN, Texas |
| BILL NELSON, Florida | TOM COBURN, Oklahoma |
| ROBERT MENENDEZ, New Jersey | JOHN THUNE, South Dakota |
| THOMAS R. CARPER, Delaware | RICHARD BURR, North Carolina |
| BENJAMIN L. CARDIN, Maryland | |

RUSSELL SULLIVAN, *Staff Director*
CHRIS CAMPBELL, *Republican Staff Director*

(II)

# C O N T E N T S

————————

|  | Page |
|---|---|
| Introduction | 1 |
| Findings | 2 |
| Background on InFuse | 2 |
| Medtronic's Financial Relationships to Physician Authors of rhBMP–2 Studies | 4 |
| Medtronic Employees Were Substantively Involved in Producing Journal Articles Authored by the Company's Physician Consultants | 6 |
| Medtronic Recommended Omitting Discussion of Adverse Events Possibly Associated With the Product in a 2005 Publication | 8 |
| Medtronic Sought to Emphasize Pain in Alternative Treatments | 11 |
| Medtronic Attempted to Downplay Cervical Spine Side Effects in a 2006 Publication | 13 |
| Omission of Retrograde Ejaculation Rates in Investigative Patient Groups | 14 |
| Medtronic Wrote Author Responses to Peer-Review | 15 |
| PEEK Spacer Cervical Spine Study | 17 |
| Expert Testimony to the FDA Written By Medtronic | 18 |
| Conclusion | 18 |
| Appendix—Exhibits | 21 |

## Introduction

The United States Senate Committee on Finance (Committee) has jurisdiction over the Medicare and Medicaid programs. As the Chairman and a senior member and former Chairman of the Committee, we have a responsibility to the more than 100 million Americans who receive health care coverage under these programs to oversee their proper administration and ensure the taxpayer dollars are appropriately spent on safe and effective medical treatments. On June 21, 2011, the Committee staff initiated an inquiry into whether Medtronic, Inc. (Medtronic or the Company) improperly influenced peer-reviewed studies of Medtronic's bone-growth product InFuse, also known as bone morphogenetic protein 2 (BMP–2).

The Committee staff's inquiry was prompted by reports alleging that physician authors who had financial ties to Medtronic failed to report dangerous side effects associated with InFuse. These dangerous side effects were subsequently reported by medical researchers that did not have financial relationships with the company.[1]

A week later, on June 28, 2011, *The Spine Journal* devoted an entire publication to exposing a pattern of academic surgeons with financial ties to Medtronic omitting mention of serious side effects associated with InFuse.[2] The analysis, led by Dr. Eugene Carragee at Stanford University, identified 13 studies sponsored by Medtronic where there was absolutely no reporting of adverse events associated with InFuse.[3] However, *The Spine Journal* found the rate of adverse events related to the use of InFuse ranged from 10%–50%.[4]

In response to the June 21, 2011 request by Chairman Baucus and Senator Grassley, Medtronic produced more than 5,000 documents pertaining to the 13 rhBMP–2 studies analyzed in *The Spine Journal*. The documents included the amount of money Medtronic paid to physician authors, e-mail communication between Medtronic employees, and e-mails between Medtronic employees and physician authors pertaining to drafts of peer-reviewed articles reporting the results of the Medtronic-sponsored clinical trials. After thorough review of the documents submitted by Medtronic and other materials, the Committee staff makes the following findings:

---

[1] "New Study Links Spine Product From Medtronic to Risk of Sterility in Men," *New York Times*, May 25, 2011; "Researchers get royalties, papers omit sterility link," *Milwaukee Journal Sentinel*, May 25, 2011.

[2] "Spine Experts Repudiate Medtronic Studies," *New York Times*, June 28, 2011.

[3] "A critical review of recombinant human bone morphogenetic protein–2 trials in spinal surgery: emerging safety concerns and lessons learned," *The Spine Journal* 11 (2011) 471–491 at *http://www.spine.org/Documents/TSJJune2011_Carragee_etal_CriticalRev.pdf*.

[4] *Id.*

2

## Findings

- Medtronic was heavily involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's significant role in authoring or substantively editing these articles was not disclosed in the published articles. Medical journals should ensure industry role contributions be fully disclosed.
- Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other miscellaneous arrangements.
- An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events possibly associated with InFuse in a 2005 *Journal of Bone and Joint Surgery* article.
- Medtronic officials inserted language into studies that promoted InFuse as a better technique than taking a bone graft from the pelvic bone (autograft technique) by emphasizing the pain of the autograft technique.
- Documents indicate that Medtronic prepared Dr. Hal Mathew's remarks to the U.S. Food and Drug Administration (FDA) advisory panel meeting prior to InFuse being approved. At the time, Dr. Mathews was a private physician but was hired as a vice president at Medtronic in 2007.
- Medtronic documents show the company unsuccessfully attempted to adopt weaker safety rules for a clinical trial studying InFuse in the cervical spine that would have allowed the company to continue the trial in the event that patients experienced severe swelling in the neck.

## Background on InFuse

In 2002, the FDA approved InFuse (also known as rh–BMP–2 or bone morphogenetic protein 2), a genetically engineered protein that stimulates bone growth for use in spinal fusion surgery in conjunction with the LT-Cage Lumbar Tapered Fusion Device to treat degenerative disc disease in the lower spine.[5]

Degenerative disc disease is a condition where the discs between spinal vertebrae deteriorate with age and can be a source of back pain. In some cases, degenerative disc disease is treated with spinal fusion surgery where the degenerated disc is removed and the adjacent vertebrae are joined together with a bone graft material to eliminate pain.[6] Medtronic promotes the use of InFuse for spinal surgery as a way to eliminate surgery and pain associated with the

---

[5] See FDA's brief overview of the InFUSE™ Bone Graft/LT–CAGE™ Lumbar Tapered Fusion Device at *http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovals andClearances/Recently-ApprovedDevices/ucm083423.htm.*

[6] Handout on Health: Back Pain, April 2012, National Institute of Arthritis and Musculoskeletal and Skin Diseases, NIH at *http://www.niams.nih.gov/health__info/back__pain/ default.asp.*

3

autograft procedure, where bone is harvested from the patient's hip for use in the spine.[7]

The FDA's 2002 approval of InFuse was limited to spinal surgeries using the anterior lumbar interbody fusion (ALIF) technique. The ALIF approach allows surgeons to access the spine through the abdomen but does not involve "retraction of the spinal nerves and neurologic structures" which decreases the "risk of neurologic injury."[8] During the FDA advisory committee hearing prior to the approval of InFuse, concerns were expressed about the high potential for off-label use.[9] The Agency for Healthcare Research and Quality (AHRQ) estimates that, in 2009, only 21,240 of 140,467 spinal fusion surgeries with InFuse were performed using the anterior lumbar technique. The remaining 119,227 hospital stays were associated with off-label spinal fusion techniques such as posterior lumbar fusion and cervical spinal fusion.[10] This AHRQ estimate is consistent with a widely cited figure that "at least 85% of InFuse use is now off-label."[11]

Figure 1.



* Includes posterior lumbar interbody fusion (PLIF), transforaminal lumbar interbody fusion (TLIF), and extreme lateral interbody fusion (XLIF).
† Includes anterior dorsal fusion, posterior dorsal fusion, lateral transverse lumbar fusion, and posterolateral lumbar fusion.
Source: Agency for Healthcare Reserach and Quality, Center for Delivery, Organization, and Markets, Healthcare Cost and Utilization Project, Nationwide Inpatient Sample, 2002–2009.

---

[7] "Questions and Answers—Infuse Bone Graft and LT Cage Device," available on Medtronic website.
[8] "Anterior Lumbar Interbody Fusion (ALIF)—Overview and Indications," USC Center for Spinal Surgery, University of Southern California at *http://www.uscspine.com/treatment/anterior-lumbar-fusion.cfm.*
[9] FDA Advisory Panel Meeting, January 10, 2002, FDA at *http://www.fda.gov/ohrms/dockets/ac/02/transcripts/3828t1.htm.*
[10] "Trends in Hospital Stays For Spinal Fusion Using Recombinant Human Bone Morphogenetic Protein," Healthcare Cost and Utilization Project, AHRQ.
[11] "Medtronic Surgeons Held Back, Study Says," *Wall Street Journal*, June 29, 2011.

4

Table 1.

Hospital stays involving spinal fusion procedures using BMP, 2002–2009

|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|
| Cervical spinal fusion | 377 | 3,656 | 7,590 | 8,805 | 14,548 | 18,955 | 18,887 | 18,769 |
| Anterior lumbar fusion | 920 | 8,166 | 13,511 | 13,239 | 15,870 | 17,774 | 19,820 | 21,240 |
| Posterior lumbar fusion * | 978 | 12,667 | 29,460 | 42,997 | 56,185 | 61,382 | 80,367 | 83,347 |
| All other spinal fusion stays involving insertion of BMP † | 174 | 2,783 | 6,126 | 10,351 | 11,828 | 12,862 | 16,329 | 17,161 |

* Includes posterior lumbar interbody fusion (PLIF), transforaminal lumbar interbody fusion (TLIF), and extreme lateral interbody fusion (XLIF).

† Includes anterior dorsal fusion, posterior dorsal fusion, lateral transverse lumbar fusion, and posterolateral lumbar fusion.

Source: Agency for Healthcare Research and Quality, Center for Delivery, Organization, and Markets, Healthcare Cost and Utilization Project, Nationwide Inpatient Sample, 2002–2009.

In 2008, the FDA published a public health notification linking the off-label use of InFuse in the cervical spine with life-threatening swelling in patient's throats and necks.[12] The *Wall Street Journal* reported at the time that "the agency . . . received 38 reports over four years of side effects, mainly swelling of neck and throat tissue, which resulted in compression of the airway and other structures in the neck."[13] In addition, the *Wall Street Journal* reported that "[a]t least three-quarters of the roughly 200 'adverse events' reported to the FDA involve off-label uses of InFuse."[14]

In March 2011, the FDA declined to approve a higher-strength version of InFuse called Amplify due to concerns that the product may cause cancer.[15] Later that year, Dr. Eugene Carragee of Stanford University presented data at a spinal surgeon conference that he believes demonstrates that the patient group that received Amplify experienced a "significantly higher number of cancers . . . compared to a control group that received a bone graft" but was not reported in a 2009 industry-sponsored publication on Amplify.[16] Dr. Carragee told the *New York Times* that "doctors often administered InFuse off-label at levels significantly above the recommended dosages, ones that approach or exceed the amount of rhBMP–2 found in a dose of Amplify."[17]

## Medtronic's Financial Relationships to Physician Authors of rhBMP–2 Studies

Medtronic produced a list of payments to physician authors of the 13 industry studies that were the subject of *The Spine Journal* article published in June 2011. The physicians who received pay-

---

[12] "Medtronic Product Linked to Surgery Problems," *Wall Street Journal*, September 4, 2008.

[13] *Id.*

[14] *Id.*

[15] "FDA sets back Medtronic spine product," *Star Tribune*, March 10, 2011.

[16] "Data Links High Doses of Bone Drug to Cancer," November 3, 2011, *New York Times* at *http://www.nytimes.com/2011/11/04/health/research/amplify-by-medtronic-may-raise-chance-of-cancer-data-shows.html.*

[17] *Id.*

5

ments of over $1 million from Medtronic from 1996 through 2010 are listed below along with the amount of money received.

| Year | Scott D. Boden | Charles L. Branch | J. Kenneth Burkus | Concept Properties, LLC[18] | Curtis A. Dickman |
|---|---|---|---|---|---|
| 1996 | $18,750.00 | — | — | — | $5,003.70 |
| 1997 | $75,000.00 | — | — | — | $73,239.25 |
| 1998 | $75,000.00 | $140,703.15 | $18,700.00 | — | $130,352.64 |
| 1999 | $86,957.00 | $49,238.87 | $34,712.12 | — | $41,419.50 |
| 2000 | $75,000.00 | $104,495.00 | $29,285.75 | — | $41,419.50 |
| 2001 | $73,750.00 | $150,000.00 | $149,920.00 | $636,182.00 | $56,960.00 |
| 2002 | $80,000.00 | $201,997.75 | $220,539.50 | $1,028,882.00 | $72,881.00 |
| 2003 | $82,500.00 | $180,219.99 | $268,742.50 | $1,226,179.00 | $316,215.00 |
| 2004 | $138,500.00 | $175,473.78 | $360,447.78 | $4,992,137.00 | $320,045.99 |
| 2005 | $1,364,100.00 | $127,087.44 | $331,070.44 | $13,141,165.00 | $339,338.00 |
| 2006 | $1,782,550.00 | $136,390.58 | $613,849.71 | $8,842,157.00 | $401,138.77 |
| 2007 | $3,400,875.00 | $114,159.39 | $719,281.84 | $9,683,098.00 | $383,192.00 |
| 2008 | $21,543,052.00 | $487,688.50 | $1,928,503.35 | $9,159,891.00 | $388,248.00 |
| 2009 | — | $460,319.35 | $732,563.85 | $7,117,112.00 | $355,809.00 |
| 2010 | — | $827,851.81 | $972,719.99 | $9,004,465.00 | $389,099.00 |
| Total | $28,796,034.00 | $3,155,625.61 | $6,380,336.83 | $64,831,268.00 | $3,272,941.85 |

| Year | John R. Dimar, III | Steven D. Glassman | Matthew F. Gornet | Regis W. Haid, Jr. | John G. Heller |
|---|---|---|---|---|---|
| 1996 | $6,250.00 | $6,250.00 | — | — | — |
| 1997 | $27,000.00 | $25,000.00 | $1,880.00 | $27,500.00 | — |
| 1998 | $50,000.00 | $50,000.00 | — | $216,842.44 | $10,892.00 |
| 1999 | $52,022.65 | $50,216.41 | $29,900.00 | $1,019,832.54 | $70,817.57 |
| 2000 | $50,000.00 | $50,976.43 | $16,369.97 | $1,507,242.15 | $30,000.00 |
| 2001 | $188,428.00 | $194,528.00 | $15,128.00 | $1,394,390.61 | $37,975.10 |
| 2002 | $100,100.00 | $71,750.00 | $4,762.00 | $1,669,745.11 | $1,161.73 |
| 2003 | $116,283.65 | $138,941.44 | $10,194.00 | $1,757,742.86 | $49,191.50 |
| 2004 | $104,043.67 | $146,137.07 | $17,924.00 | $2,484,450.94 | $42,957.44 |
| 2005 | $147,207.99 | $248,019.59 | $67,763.93 | $2,473,518.00 | $154,835.70 |
| 2006 | $236,306.95 | $155,753.16 | $238,787.49 | $2,454,569.00 | $149,215.39 |
| 2007 | $130,767.60 | $257,926.16 | $649,542.33 | $2,626,576.07 | $330,792.15 |
| 2008 | $234,094.50 | $187,605.50 | $1,181,039.87 | $2,467,911.23 | $288,957.11 |
| 2009 | $160,551.00 | $88,139.80 | $892,500.87 | $2,525,743.88 | $255,236.24 |
| 2010 | $163,310.20 | $75,019.80 | $859,983.76 | $2,723,749.13 | $352,404.36 |
| Total | $1,766,366.21 | $1,748,263.36 | $3,985,776.22 | $25,549,813.96 | $1,774,436.29 |

| Year | Inspire, LLC[19] | Gerald E. Rodts, Jr. | Volker Sonntag | Ensor E. Transfeldt | Thomas A. Zdeblick |
|---|---|---|---|---|---|
| 1996 | — | — | — | $12,500.00 | $95,185.34 |
| 1997 | — | — | $34,745.92 | $50,000.00 | $422,668.65 |
| 1998 | — | $25,065.54 | $207,622.16 | $56,196.00 | $838,794.89 |
| 1999 | — | $44,748.08 | $795,053.91 | $61,219.28 | $1,131,463.17 |
| 2000 | — | $152,496.47 | $1,756,041.55 | $56,170.90 | $1,037,381.49 |
| 2001 | — | $140,343.39 | $1,036,993.00 | $71,117.56 | $1,984,356.45 |
| 2002 | — | $172,278.04 | $1,646,050.49 | $115,315.16 | $3,471,930.41 |
| 2003 | — | $142,025.68 | $1,904,689.00 | $258,912.62 | $4,580,361.62 |
| 2004 | — | $161,149.02 | $2,278,639.00 | $299,477.72 | $4,447,269.00 |
| 2005 | — | $303,877.98 | $2,202,595.00 | $30,474.70 | $3,950,516.08 |
| 2006 | — | $396,139.57 | $2,090,998.00 | $206,388.76 | $3,469,863.71 |
| 2007 | $247,365.00 | $629,451.53 | $2,163,661.90 | $722,779.00 | $2,961,272.00 |
| 2008 | $329,998.00 | $581,984.26 | $2,271,477.00 | $548,584.74 | $2,521,170.00 |
| 2009 | $698,829.00 | $432,403.00 | $1,772,361.00 | $483,254.00 | $1,582,156.00 |
| 2010 | $1,632,813.00 | — | $2,241,156.00 | $589,930.00 | $1,674,351.00 |
| Total | $2,909,005.00 | $3,181,962.56 | $22,852,083.93 | $3,562,320.44 | $34,168,739.81 |

More detailed information concerning Medtronic's physician payments is available in the appendix to this report.[20]

---

[18] According to filings with the Office of the Secretary of State of Kentucky, John R. Dimar, III and Steven D. Glassman are listed as current officers of Concept Properties, LLC as of June 18th, 2012.
[19] According to an attachment to Medtronic's June 21, 2011 letter to the Committee, the Company "believes that Inspire, LLC is owned by physicians including Dr. Transfeldt."
[20] See page 22.

6

## Medtronic Employees Were Substantively Involved in Producing Journal Articles Authored by the Company's Physician Consultants

A review of the documents Medtronic provided to the Committee demonstrates that Medtronic employees, including employees working for its marketing department, collaborated with physician authors, many of whom had significant financial relationships with Medtronic, to draft the following studies:

- Burkus JK, Gornet MF, Dickman CA, Zdeblick TA. Anterior lumbar interbody fusion using rhBMP–2 with tapered interbody cages. *J. Spinal Disord. Tech.* 2002; 15:337–49.[21]
- Burkus JK, Transfeldt EE, Kitchel SH, et al. Clinical and radiographic outcomes of anterior lumbar interbody fusion using recombinant human bone morphogenetic protein–2. *Spine* 2002.[22]
- Burkus JK, Heim SE, Gornet MF, Zdeblick TA. Is INFUSE bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT–CAGE lumbar tapered fusion device. *J. Spinal Disord. Tech.* 2003.[23]
- Baskin DS, Ryan P, Sonntag V, et al. A prospective, randomized, controlled cervical fusion study using recombinant human bone morphogenetic protein–2 with the CORNERSTONE–SR allograft ring and the ATLANTIS anterior cervical plate. *Spine* 2003.[24]
- Burkus JK, Dorchak JD, Sanders DL. Radiographic assessment of interbody fusion using recombinant human bone morphogenetic protein type 2. *Spine* 2003.[25]
- Haid RW, Branch CL, Alexander JT, Burkus JK. Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages. *Spine J.* 2004.[26]
- Burkus JK, Sandhu HS, Gornet MF, Longley MC. Use of rhBMP–2 in combination with structural cortical allografts

---

[21] See correspondence and draft articles MSD–R062111–033531—MSD–R062111–033562; MSD–R062111–033566—MSD–R062111–033568—MSD–R062111–033612; MSD–R062111–033616; MSD–R062111–040460—MSD–R062111–040463; MSD–R062111–077880—MSD–R062111–077920; MSD–R062111–033822—MSD–R062111–033862; MSD–R062111–080852—MSD–R062111–080894.

[22] See correspondence and draft articles MSD–R062111–033047—MSD–R062111–033079; MSD–R062111–033225—MSD–R062111–033256; MSD–R062111–033631—MSD–R062111–033668; MSD–R062111–033748—MSD–R062111–033784; MSD–R062111–055062—MSD–R062111–055067; MSD–R062111–033972—034006.

[23] See correspondence and draft articles MSD–R062111–064299—MSD–R062111–064284; MSD–R062111–064346—MSD–R062111–064373; MSD–R062111–067943—MSD–R062111–067971; MSD–R062111–080895—MSD–R062111–080899; MSD–R062111–080956—MSD–R062111–080983.

[24] See correspondence and draft articles MSD–R062111–034007—MSD–R062111–034039; MSD–R062111–034087—MSD–R062111–034189.

[25] See correspondence and draft articles MSD–R062111–033112—MSD–R062111–033126; MSD–R062111–064232—MSD–R062111–064245; MSD–R062111–033434—MSD–R062111–033450; MSD–R062111–033669—MSD–R062111–033688.

[26] See correspondence and draft articles MSD–R062111–040537—MSD–R062111–040561; MSD–R062111–069990—MSD–R062111–069997; MSD–R062111–078885—MSD–R062111–078895; MSD–R062111–034221—MSD–R062111–034224; MSD–R062111–068009—MSD–R062111–068070; MSD–062111–040735—MSD–062111–040773; MSD–R062111–040848—R062111–040887; MSD–R062111–068275—MSD–R062111–068309; MSD–R062111–040912—MSD–R062111–041018; MSD–R062111–068487—MSD–R062111–068541; MSD–R062111–079038—MSD–R062111–079039.

7

surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion. *J. Bone Joint Surg. Am.* 2005; 87:1205–12.[27]

- Glassman SD, Dimar JR, Burkus K, et al. The efficacy of rhBMP–2 for posterolateral lumbar fusion in smokers. *Spine* 2007.[28]
- Dimar JR, Glassman SD, Burkus JK, et al. Clinical and radiographic analysis of an optimized rhBMP–2 formulation as an autograft replacement in posterolateral lumbar spine arthrodesis. *J. Bone Joint Surg. Am.* 2009.[29]
- Burkus JK, Gornet MF. Six-Year Outcomes of Anterior Lumbar Interbody Arthrodesis with Use of Interbody Fusion Cages and Recombinant Human Bone Morphogenetic Protein–2. *JBJS* 2009.[30]
- Dawson E, Bae HW, Burkus JK, et al. Recombinant human bone morphogenetic protein–2 on an absorbable collagen sponge with an osteoconductive bulking agent in posterolateral arthrodesis with instrumentation. A prospective randomized trial. *J. Bone Joint Surg. Am.* 2009.[31]

Medtronic told the Committee that it instituted policies, beginning in the mid-2000s, to ensure that interactions between the company and physician authors regarding peer-reviewed publications are "appropriate."[32] These policies include:

- Prohibiting the compensation of "a researcher to speak about or broadly disseminate research findings prior to FDA approval of the unapproved uses, other than providing a report of publishable quality to Medtronic and/or a peer reviewed journal for publication."—implemented in April 2006.
- Requiring "that clinical trial outcomes be presented without bias and with full disclosure."—implemented on January 8, 2008.
- Requiring "that a Medtronic employee's contribution to any publication must be appropriately disclosed, according to the standards of the International Committee of Medical Journal Editors ("ICMJE")."—implemented in 2009.
- Barring "Sales and Marketing personnel from participating in a publication project as an author or contributor. Only employees in the Clinical, Medical Affairs, or Research and Development Departments were permitted to serve as authors or contributors (as defined by ICMJE Guidelines), and only with disclosure."—implemented on August 8, 2010.

---

[27] See correspondence and draft articles MSD–R062111–034854—MSD–R062111–034894; MSD–R062111–034957—MSD062111–034994; MSD–R062111–061701—MSD–R062111–061708; MSD–R062111–064785—MSD–R062111–064787.

[28] See correspondence and draft articles MSD–R062111–065102—MSD–R062111–065120; R062111–065287—R062111–065317; MSD–R062111–043742—MSD–R062111–043775.

[29] See correspondence and draft articles MSD–062111–R065138—MSD–R062111–065155; MSD–R062111–043226—MSD–R062111–043246; MSD–R062111–056122—MSD–R062111–056142; MSD–R062111–037519—MSD–R062111–037546; MSD–R062111–046108—MSD–R062111–046160; MSD–R062111–067520—MSD–R062111–067566.

[30] See correspondence and draft articles MSD–R062111–058250—MSD–R062111–058285; MSD–R062111–045886—MSD–R062111–045954; MSD–R062111–046823—MSD–R062111–046900; MSD–R062111–037797—MSD–R062111–037821; MSD–R062111–047304—MSD–R062111–047332; MSD–R062111–060896—060898; MSD–R062111–049092—MSD–R02111–049100.

[31] See correspondence and draft articles MSD–R062111–059388—MSD–R062111–059410; MSD–R062111–060390—MSD–R062111–060421.

[32] Letter from Medtronic to the Senate Finance Committee, May 1, 2012; Medtronic policies, MSD–R021612–000187—MSD–R021612–000435.

8

- Prohibiting "Marketing personnel from making any contributions to the Discussion section of a publication, whether or not their contribution rises to the level of contributorship under ICMJE Guidelines" and prohibiting "any employees not identified as authors or contributors from contributing to the Discussion section."—implemented on October 11, 2011.

- Requiring that "all authors sign a standardized authorship agreement clarifying (1) the authors' responsibility to fully disclose relationships with Medtronic in any related publication, (2) the authors' responsibility to ensure appropriate attribution of authorship and contributorship, and (3) the authors' acknowledgement that Medtronic will not compensate physicians for writing or editing activities."—implemented on December 6, 2011.

The company defends collaboration between company employers and physician authors as "a well-established and widely-accepted part of the peer review process used to subject articles to critical scrutiny, as a medical device company like Medtronic typically maintains the most complete set of data relating to the use, as well as properties of its devices and thus is uniquely positioned to make valuable contributions to potential articles."[33] Further, Medtronic maintains that "the content of these articles is ultimately controlled by the authors."[34] The company wrote:

> Some of the employees who reviewed these articles resided nominally in the "Marketing" Department, but these employees generally are technically and scientifically trained who have earned doctoral or other advanced degrees in relevant disciplines and draw on deep expertise in the science of bone morphogenetic proteins, in the design and implementation of clinical studies, in technical expression of clinical practice, and in statistical analysis. Importantly, at [Medtronic Spinal Biologics] the Marketing Department is distinct from the Sales Department. Marketing personnel are tasked with, among other things, anticipating the needs of Medtronic's physician customers, following the latest scientific and clinical developments in the field, and using evidence to obtain wider approvals, use, and acceptance of products. Sales personnel, on the other hand, are designated to interact directly with customers for the purpose of effecting sales. In every case, however, physicians—not Medtronic personnel—prepare draft manuscripts, select content, approve suggested modifications, and are responsible for the final article content that they submit for publication and review by the scientific community.[35]

### Medtronic Recommended Omitting Discussion of Adverse Events Possibly Associated With the Product in a 2005 Publication

According to the FDA's Summary of Safety and Effectiveness Data of the 2002 IDE InFuse product, "the incidence of adverse

---

[33] *Id.*
[34] *Id.*
[35] *Id.*

9

events that were considered device related, including implant displacement/loosening, implant malposition and subsidence were all greater in the investigational groups [that received InFuse] compared to the control group."[36] However, documents indicate that a Medtronic employee involved in editing a draft of the 2005 *Journal of Bone and Joint Surgery (JBJS)* article by Burkus, et al. about a similar InFuse procedure involving allograft bone (a cage made from donated bone rather than the FDA-approved titanium), recommended that "significant detail" concerning adverse event data should not be published.[37]

On June 16, 2004, Dr. Julie Bearcroft, Director of Technology Management in Medtronic's Biologics Marketing Department, wrote an e-mail to other Medtronic employees, commenting on a draft of the study, "I have made some significant changes to this document (some at the request of Dr. Burkus) both in format and content."[38] In this e-mail, she asked: "How much information should we provide relative to adverse events? . . . You will see my [note] in the attached document but I don't think significant detail on this section is warranted."[39] The referenced note in the draft article stated: "I don't believe we want to report in the same manner as we do in IDE studies. I personally think it is appropriate to simply report the adverse events were equivalent in the two groups without the detail."[40] According to an internal e-mail, the adverse events were observed in the trial and formatted in a detailed table.[41] But following the advice of Bearcroft, this table of adverse events was not included in the published paper.[42]

On July 3, 2004, after Medtronic edited the paper, Dr. Burkus sent a draft to his co-authors writing that "this manuscript documents the superiority in clinical and radiographic outcomes with the use of rhBMP2 in a study population of only 133 patients."[43]

According to the Carragee et al. *Spine Journal* article published in 2011, the 2005 *JBJS* article "reported no complications, such as end-plate fracture, collapse, and implant migration associated with rhBMP–2 despite the clear radiographic findings in at least the one presented case."[44] The e-mail exchange indicates that, in addition to Medtronic editing the manuscript without attribution, the company was recommending that the article omit a complete accounting of adverse event data, including serious adverse event data that were already considered a documented concern by FDA in similar application.

---

[36] FDA Summary of Safety and Effectiveness for InFuse Bone Graft/LT–Cage Lumbar Tapered Fusion Device, available at *http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058b.pdf*.
[37] E-mail from Julie Bearcroft, June 16, 2004, MSD–R062111–034854.
[38] *Id.*
[39] E-mail from Dr. Burkus, July 3, 2004, MSD–R062111–034957.
[40] *Id.*
[41] E-mail between Medtronic Employees on June 7, 2004, MSD–R062111–064785.
[42] E-mail between Medtronic Employees on June 7, 2004, MSD–R062111–064785.
[43] E-mail from Dr. Burkus, July 3, 2004, MSD–R062111–034957.
[44] *The Spine Journal* 11 (2011) 471–491.

10

| From: | Bearcroft, Julie, PhD |
|---|---|
| Sent: | Wednesday, June 16, 2004 10:04:33 AM |
| To: | Treharne, Rick; Beals, Neil; Lipscomb, Bailey; McKay, Bill |
| CC: | Ma, Guorong; Peckham, Steve, Ph.D.; King, Vanja, Ph.D.; Woodward, Lyndsay; Hood, Tara |
| Subject: | Combined pilot & pivotal rhBMP-2/TCBD draft manuscript |
| Attachments: | Bone Dowel BMP superiority revision without tracking changes 061104.doc |

Additional issues that I would like to propose that we consider include –
1) How much information should we provide relative to adverse events? Lyndsay provided with some of
the specifics behind the general numbers in the tables to better understand if there are significant
issues here. Most of these are applicable to issues that fall outside of involved level. You will see my not
in the attached document but I don't think significant detail on this section is warranted. Thoughts?

ALIF rhBMP2 Bone Dowels                                                                          20
Burkus,Sandhu,Gornet,Longley

as we do in IDE studies. I personally think it is appropriate to simply report that they
were equivalent in the two groups without the detail.)

These types of adverse events were disclosed in Table V of a 2009 follow-up article concerning the original IDE study.[45] Studies published in 2007 revealed that InFuse is associated with "a clinically important early inflammatory and osteoclastic effect of the rhBMP–2 in soft tissue and bone, respectively."[46] In other words, Medtronic recommended against including information in the study that was ultimately revealed to have an association between In-Fuse and weakening that could lead to collapse of the bone and implant and required that patients undergo additional surgery.

The CONSORT (Consolidated Standards of Reporting Trials) Group, an organization that develops guidelines for reporting randomized controlled trials endorsed by medical journals such as the *New England Journal of Medicine* and the *Journal of the American Medical Association,* recommended in its guidelines in 2001 that "[a]ll important adverse events or side effects in each intervention group" should be reported in the "Results" section of a publication of a randomized trial.[47] Although not in effect at the time Bearcroft made the recommendation, in 2004, the CONSORT group identified the practice of "providing summed numbers for all adverse events for each study arm, without separate data for each type of adverse event" as a "poor reporting practice."[48] The adverse events observed in the allograft trial were observed and formatted in a table, but following the advice of Bearcroft, the table was not included in the published paper.[49]

[45] Burkus, et al., "Six-Year Outcomes of Anterior Lumbar Interbody Arthrodesis with Use of Interbody Fusion Cages and Recombinant Human Bone Morphogenetic Protein–2," *JBJS* 2009.
[46] *The Spine Journal* 11 (2011) 471–491.
[47] Moher, et al., "The CONSORT Statement: Revised Recommendations for Improving the Quality of Reports of Parallel-Group Randomized Trials," *JAMA*, April 18, 2001.
[48] "Better Reporting of Harms in Randomized Trials: An Extension of the CONSORT Statement," *Ann. Intern. Med.*, 2004; 141:781–788 at *http://www.annals.org/content/141/10/781.full.pdf+html.*
[49] E-mail between Medtronic Employees on June 7, 2004, MSD–R062111–064785.

11

## Medtronic Sought to Emphasize Pain
## in Alternative Treatments

Documents show that Medtronic edited draft publications to stress the pain patients experienced from undergoing a bone graft procedure instead of receiving InFuse. Medtronic markets InFuse as a less painful alternative to bone graft procedures for patients undergoing spinal fusion surgery. Medtronic's website states: "According to numerous studies, the harvesting procedure is actually more painful than the fusion itself, and nearly a third of patients experience hip pain two years following surgery. When compared to traditional spinal fusion procedures, INFUSE® Bone Graft, when used with the LT–CAGE® Device, eliminates the pain and blood loss, and reduces the amount of time spent in the hospital to treat complications resulting from the second site of surgery." [50]

However, spinal surgeons are beginning to question whether "the oft-cited 'painful iliac crest donor site' is less serious and frequent than BMP enthusiasts would have us believe" after a recent study showed that "[t]he incidence of pain over the iliac crest was similar in patients in which iliac crest was harvested and those in which no graft was harvested." [51]

After receiving a draft of an early InFuse study [52] to review in October 2001, Medtronic's Neil Beals, whose "primary job responsibility was to manage Biologics marketing programs and initiatives," [53] recommended that the physician authors of the study emphasize pain experienced by patients who received the bone graft. The patients were divided into an investigative group that received InFuse and a control group that received a bone graft obtained from the iliac crest of their pelvis.[54] An October 31, 2001 e-mail shows that Beals suggested to Dr. Burkus that "a bigger deal should be made of elimination of donor site pain with INFUSE . . . so that 'equivalent' results aren't received as a let down." [55] Again, after reviewing a later draft of the study, Beals asked Dr. Burkus on March 8, 2002, "would it be appropriate to make a bigger deal out of donor site pain and include more discussion and references?" [56] Subsequently, a sentence was inserted at the end of a later draft, and included in the published version of the article, that read, "The use of rhBMP–2 is associated with high fusion

[50] Medtronic INFUSE® Bone Graft + LT–CAGE® Lumbar Tapered Fusion Device Fact Sheet, *http://www.p.medtronic.com/Newsroom/LinkedItemDetails.do?itemId=1101769224707&itemType=fact_sheet&lang=en_US*.

[51] Hu, Serena S., "Commentary: Illiac crest bone graft: are the complications overrated?" *The Spine Journal*, June 2011, *http://www.spine.org/Documents/TSJJune2011_Hu_Commentary.pdf*; Howard et. al., "Posterior iliac crest pain after posterolateral fusion with or without iliac crest graft harvest," *The Spine Journal*, June 2011, *http://www.spine.org/Documents/TSJJune2011_Howard_etal_PosteriorIliacCre.pdf*.

[52] "Anterior lumbar interbody fusion using rhBMP–2 with tapered interbody cages," *J. Spinal Disord. Tech.* 2002 Oct; 15(5):337–49, *http://www.ncbi.nlm.nih.gov/pubmed/12394656*.

[53] Medtronic provided the Committee with this summary of Neil Beals's job titles and corporate responsibilities in a correspondence on May 5, 2012: "Neal Beals, M.S., M.B.A. is the former Vice President of Biologics Marketing, a position he held from February 2003 to August 2011. Mr. Beals joined Sofamor Danek in 1998 as Group Director, Tissue/Biologics within the Interbody Division. He held this position until October 2000 when he became Group Director, Biologics. He became Vice President of Biologics Marketing in 2003 and a Corporate Vice President in 2007. In these positions, his primary job responsibility was to manage Biologics marketing programs and initiatives."

[54] "Anterior lumbar interbody fusion using rhBMP–2 with tapered interbody cages," *supra* at 32.

[55] E-mail from Neil Beals to Dr. Burkus, October 31, 2001, MSD–R062111–033566.

[56] E-mail from Neil Beals to Dr. Burkus, March 8, 2002, MSD–R062111–077880.

12

rates without the need for harvesting bone graft from the iliac crest and exposing the patient to the adverse effects associated with that procedure." [57]



Medtronic also sought to include discussion of long-term pain in the Baskin, et. al. 2003 paper on InFuse in the cervical spine. In a draft of the publication that was being circulated on August 30, 2002, the authors wrote, "[b]y 12 months after surgery, the patients [sic] graft-site pain had resolved . . . and no patients complained about the graft-site appearance." Beals inserted comments after this sentence stating, "ALTHOUGH THE PATIENTS DID NOT COMPLAIN ABOUT APPEARANCE DIDN'T SOME STILL EXPERIENCE PAIN AT THE DONOR SITE? SEEMS LIKE RESIDUAL EFFECTS OF DONOR SITE SHOULD BE NOTED." [58] [sic] [emphasis in original]. In an e-mail to his colleague, Beals wrote, "I would also add in more discussion on donor site pain and need for osteogenetic graft material (plant seed of doubt for just using allograft by itself)." [59] A review of the final published article reveals that, after Beals made the suggestion to emphasize pain at the bone graft site, a sentence was added in the final version of the article that read, ". . . even at the 24-month follow-up assessment, some patients continued to experience residual pain at the donor site, and rated the appearance of the site as only fair."

[57] Compare drafts attached to e-mails from Dr. Burkus to Neil Beils on March 8, 2002, MSD–R062111–078880, MSD–R062111–077882 and April 4, 2002, MSD–R062111–033863, MSD–R062111–033825.
[58] Draft copy of Baskin et. al. study e-mailed on August 30, 2002, MSD–R062111–034124.
[59] *Id.*

13

of the graft site. By 12 months after surgery, the patients graft-site pain had resolved (p

< 0.165) and no patients complained about the graft-site appearance. ALTHOUGH

THE PATIENTS DID NOT COMPLAIN ABOUT APPEARANCE DIDN'T SOME STILL

EXPERIENCE PAIN AT DONOR SITE?  SEEMS LIKE RESIDUAL EFFECTS OF

DONOR SITE SHOULD BE NOTED

| From: | Neil Beals |
|---|---|
| Sent: | Friday, August 30, 2002 01:23:35 PM |
| To: | Mark Marchan |
| CC: | Julie Bearcroft; Jim Van Hoeck; Bill McKay; Missy Taylor |
| Subject: | FW: Revised BMP paper and response |
| Attachments: | Resubmission Cervical BMP Paper 082902.doc; Resubmission Cervical BMP Paper 082302.doc; Response letter 2.doc; Rev 1.jpg |

- I would also add in more discussion on donor site pain and need for osteogenic graft material (plant seed of doubt for just using allograft by itself)

## Medtronic Attempted to Downplay Cervical Spine Side Effects in a 2006 Publication

In 2008, "the FDA issued an alert after receiving reports of life-threatening complication following cervical fusion procedures involving [bioengineered proteins such as InFuse], including breathing difficulty and swelling of the neck." [60] Additionally, a study published in the *Journal of the American Medical Association* found that "[p]atients who received a bioengineered protein during spinal fusion procedures to correct neck pain had far more complications than patients who did not get it." [61]

E-mails show that Rick Treharne, Senior Vice President of Clinical and Regulatory Affairs at Medtronic, unsuccessfully attempted to tone down a study SPINE published in 2006 that found a "significant rate of complications . . . after the use of a high dose of [rhBMP–2] in anterior cervical fusions." In December 2004, Rick Treharne e-mailed a co-author of this study, Dr. Glassman, in an unsuccessful attempt to have some of the critical language in the study modified. Treharne wrote, "Again it is probably too late, but page 14 line 13 says 'The high complication rate is alarming and warrants intense scrutiny.' I think what you are trying to say is that the occurrence [sic] adverse events (not effects as in the title) in these patients was higher than expected and warrants further investigation." [62] The e-mail from Treharne was sent after the paper was submitted to SPINE.

---

[60] "Bone-Growth Problems Show Risk in New Study," *New York Times,* June 30, 2009.
[61] *Id.*
[62] E-mail from Rick Treharn to Steve Glassman, December 15, 2004, MSD–R062111–035348.

14

| From: | Treharne, Rick |
|---|---|
| Sent: | Wednesday, December 15, 2004 04:29:48 PM |
| To: | Steve Glassman (E-mail) ▪▪▪▪▪▪▪▪▪ |
| Subject: | Article Reminder |

Again it is probably too late, but page 14 line 13 says "The high complication rate is alarming and warrants intense scrutiny." I think what you are trying to say is that the occurrence adverse events (not effects as in the title) in these patients was higher than expected and warrants further investigation.

Additionally, even after Medtronic attempted to include a warning about cervical swelling on the FDA label, one Medtronic physician consultant recommended against raising alarms with the physician community. On April 8, 2004, Rick Treharne e-mailed Medtronic physician consultant Scott Boden, informing him that the company received complaints related to off-label use of InFuse in the cervical spine.[63] Dr. Boden responded that he was aware of a case of swelling where there was a "golf ball size mass in the neck clearly visible through the skin."[64] Boden recommended that surgeons needed to be continually warned about off-label use of BMP in the cervical spine.[65] Medtronic told the Committee that during this time, it voluntarily sought changes to the InFuse product label in June 17th, 2004 to notify the public of a risk of swelling when used in the cervical spine, but the effort was opposed by the FDA due to the agency's concern that adding a warning to the label about an off-label use was a form of off-label promotion. In June 2004, Rick Treharne wrote to Dr. Burkus that, based on his statistical analysis of new cases versus what was observed in the clinical trials, he did not, "at this time, see anything to worry about."[66] In August 2004, despite Dr. Boden's recommendation to Rick Treharne earlier that year that physicians should be "continually warned" about off-label use, Dr. Boden told Dr. Charles Mick of the North American Spine Society that because there wasn't enough information to identify the cause of the swellings, "it may be premature for any 'official' warning."[67] Medtronic paid Dr. Boden $705,457 through 2004 and $28,796,034 by the end of 2008. FDA granted Medtronic permission to send a "Dear Doctor" letter to physicians conveying concerns about InFuse on September 14, 2004 and placed a warning on the product label on December 7, 2004.

## Omission of Retrograde Ejaculation Rates in Investigative Patient Groups

In his 2011 *Spine Journal* article, Dr. Carragee reported that "multiple independent studies have found that the rate of [retrograde ejaculation (a condition that causes sterility)] in ALIF with rhBMP–2 is approximately 5% to 7% and possibly two to four times higher than the rate observed without rhBMP–2."[68] However, the physician authors who reported the clinical results of a major Medtronic-sponsored study in the *Journal of Spinal Disorders and*

[63] E-mail from Rick Treharne to Scott Boden, April 8, 2004, MSD–R062111–068997.
[64] E-mail from Scott Boden to Rick Treharne, April 10, 2004, MSD–R062111–068995.
[65] *Id.*
[66] E-mail from Rick Treharne to Dr. Burkus, June 14, 2004, MSD–R062111–069316.
[67] E-mail from Scott Boden to NASS President Charles Mick, August 16, 2004, MSD–R062111–069477.
[68] *http://www.spine.org/Documents/TSJJune2011__Carragee__etal__CriticalRev.pdf*, page 479.

15

*Techniques* attributed the adverse event to the surgical technique used without comparing the investigational study group receiving InFuse to the control group.[69] Dr. Carragee told the *New York Times* that the omission is significant because "[i]t is important that men who are considering having children have the opportunity to weigh the risks of the various available procedures."[70]

A February 2001 PowerPoint presentation indicates that Dr. Zdeblick was aware that retrograde ejaculation rates were higher in both investigational groups than the control group. In a PowerPoint presentation to study investigators in February 2001, Dr. Zdeblick reported a 10.3% rate of retrograde ejaculation using the laparoscopic technique, a 6.3% for patients who underwent an "open" technique, and a 1.5% rate for the control group. The 10.3% rate was noted in the presentation to be "[s]tatiscally different from [the] control [group]."[71]

**Medtronic Wrote Author Responses to Peer-Review**

E-mail exchanges between Dr. Burkus and Medtronic employees regarding a study of InFuse utilizing the posterior lumbar inter-body fusion (PLIF) technique and published in *The Spine Journal* in 2004 demonstrates that Medtronic employees not only edited the draft manuscript to include comments supportive of InFuse, they also covertly participated in the peer-review process by drafting responses to peer-reviewers on behalf of the physician authors named on the paper.

On December 21, 2002, Dr. Burkus sent a draft manuscript of the study to Medtronic officials asking for assistance with "further data analysis."[72] Bill Martin, Vice President for Spinal Marketing, Global Communications, and Medical Education at Medtronic, made it clear to other Medtronic employees that Medtronic would be in a "supporting cast" in assisting Dr. Burkus with this study rather than reworking the paper.[73]

According to a January 1, 2003, e-mail written by Bill Martin, "Dr. Burkus wanted his name last (and all the neuro's first) so that it would be well accepted by the Neurosurgical community." In addition, Martin wrote that, "I'm sure none of us believe the PLIF *technique* is going to have a resurgence from this, but we may want to steer clear of calling it a flawed technique. There are still quite a few surgeons utilizing this technique and we probably don't want to put them in that position"[74] (emphasis in original).

In a January 10, 2003, e-mail to Dr. Burkus, Rick Treharne wrote, "In looking over the data, I was impressed with how well the BMP patients actually did. So much so that I added a few paragraphs at the end that you may not agree with." In the draft article, Treharne wrote:

---

[69] *Id.*

[70] "New Study Links Spine Product From Medtronic to Risk of Sterility in Men," *New York Times*, May 25, 2011.

[71] PowerPoint presentation attached to a February 2, 2001 e-mail between Medtronic employees, MSD–R062111–032878; MSD–R062111–032916.

[72] E-mail from Dr. Burkus to Medtronic officials, December 21, 2002, MSD–R062111–040537.

[73] E-mail from Bill Martin to Neil Beals and Peter Wehrly, January 1, 2003, MSD–R062111–078885.

[74] *Id.*

16

In conclusion, this detailed, independent review of the results, which represent the first use of osteoinductive proteins in a PLIF procedure, are encouraging. These findings along with other studies for other indications imply that future larger PLIF studies with BMP–2 are needed. In future studies using modified surgical techniques, such as using more recessed cages to allow for extra posterior bone formation, adding steps to minimize bleeding, and/or adding secondary instrumentation may be beneficial. Further, possibly modifying patient selection, such as entering patients with less vertebral slip, may also help minimize confounding variables. All of these changes may produce even better, more convincing evidence that IN-FUSE Bone Graft can also be used as substitute for autograft in PLIF procedures.[75]

On February 1, 2003, Dr. Burkus e-mailed another draft of the BMP manuscript to Medtronic officials asking for "final comments."[76] On March 7, 2003, Julie Bearcroft e-mailed Dr. Burkus an updated version of this manuscript with her proposed changes to the draft.[77]

After submission of the initial draft of this study to *The Spine Journal*, physicians who peer-reviewed the article were critical of its presentation of the study results. One reviewer wrote: "Unless the authors can discuss the results of this study in an unbiased manner, which they have been unable to do in its present form, this data should not be published." Another reviewer wrote: "The manuscript is full of biased statements that are a reflection of the data evaluators—the company that markets the product." That reviewer recommended a discussion of potential bias in the text of the paper writing, "As it stands it is an advertisement for a specific product without significant scientific merit."[78]



Reviewer A

The manuscript is full of biased statements that are a reflection of the data

evaluators - the company that markets the product.  No mention is made in the

have benefit to the readership.  As it stands it is an advertisement for a specific

product without significant scientific merit.

E-mail correspondence on May 28, 2003, indicates that Medtronic's Rick Treharne wrote and sent Dr. Burkus a draft letter to Dr. Tom Mayer, Editor-in-Chief of *The Spine Journal*, to address concerns raised by orthopedic surgeons tasked with peer-reviewing the submitted PLIF paper.[79] A subsequent e-mail by Julie Bearcroft notes that she and Dr. Burkus collaborated further on the re-

[75] E-mail from Rick Treharne to Dr. Burkus, January 10, 2003, MSD–R062111–068009.
[76] E-mail from Dr. Burkus to Medtronic officials, February 1, 2003, MSD–R062111–040735.
[77] E-mail from Julie Bearcroft to Dr. Burkus, March 7, 2003, MSD–R062111–040848.
[78] E-mail from Rick Treharne to Dr. Burkus, May 28, 2003, MSD–R062111–040930.
[79] *Id.*

17

sponse to the peer-reviewers of this study during a Lumbar Spine Study Group event.[80] In response to the peer-reviewers' concerns about bias in the manuscript, the response letter seemingly misled *The Spine Journal* by stating that "To help eliminate any potential bias, only one of the co-authors was a clinical investigator—the other three were independent reviewers of all the data. Since these data are taken from a clinical IDE study sponsored by a company, only the company would have all the data in its database—data that is reviewed by FDA auditors. We don't believe any discussion of bias is needed for the text."[81] By the end of 2003, "independent reviewers" Dr. Haid and Dr. Burkus would have received $7,793,000 and $722,000 from Medtronic, respectively. This draft letter, written at least in part by Medtronic on behalf of Dr. Burkus, did not disclose the company's role in directly editing the paper nor did it disclose the magnitude of financial payments made to the supposed "independent reviewers."

Upon hearing the news that there would be an editorial by Dr. Neal Kahanovitz criticizing the PLIF study along with the paper, Medtronic Senior Vice President and President for Europe, Canada, Latin America, and Emerging Markets, Michael Demane wrote in an e-mail to Bill Martin, "this is going to hurt more than help because of the reviewers [sic] comments. Too late to turn back tho."[82] [sic]

### PEEK Spacer Cervical Spine Study

Documents show that Medtronic unsuccessfully proposed that the FDA approve a less restrictive rule for when the company must suspend patient enrollment in a clinical study of InFuse used in the cervical spine for safety reasons.[83] According to a November 1, 2006, e-mail written by Medtronic's Senior Director of Medical and Regulatory Affairs Dr. Martin Yahiro, the company proposed a weaker rule because "it would be very difficult to pin [an adverse event] on INFUSE."[84] Yahiro explained that a rule required by the FDA based on "specific events with incidence rates . . . would stop the trial when it would be hard to say it WASN'T INFUSE" (emphasis in original.)[85] Medtronic's proposed rule, according to Yahiro, was written to allow the company to continue the trial even "if a patient has an [adverse event] like severe cervical swelling" because Medtronic "can honestly say that it is not possible to know that the cause is definitely INFUSE."[86] However, the FDA rejected Medtronic's proposal and required that the company adopt stricter rules based on specific adverse event rates in its final protocol.[87]

---

[80] E-mail from Julie Bearcroft to Dr. Burkus, June 3, 2003, MSD–R062111–068487.
[81] E-mail from Rick Treharne to Dr. Burkus, May 28, 2003, MSD–R062111–040930 at 041013.
[82] E-mail from Michael DeMane to Bill Martin, March 9, 2004, MSD–R062111–079038.
[83] See documents relating to Medtronic's Investigational Device Exemptions application for a clinical trial of the Infuse Bone Graft/PEEK Interbody Spacer/Anterior Cervical Plate, MSD–R021612–000767—MSD–R021612–000790.
[84] E-mail from Dr. Martin Yahiro, November 1, 2006, MSD–R062111–073578.
[85] *Id.*
[86] *Id.*
[87] Section 6.24 of the InFuse Bone Graft/PEEK Interbody Spacer/Anterior Cervical Plate Investigational Plan Protocal, MSD–R021612–000791.

18



----- Original Message -----
From: "Yahiro, Martin, M.D." <███████████████████>
To: <jkb███████████Desrochers, Debbie> ██████████
█████████████████████>; "Bearcroft, Julie, PhD"
<████████████████████>; "Beals, Neil" <█████████
████████████████████>
Sent: Wednesday, November 01, 2006 6:24 AM
Subject: Re: Draft Stopping Rules 10_30_06.doc

> Thanks for your note. I think we're all on the same page regarding the
ability to determine the exact cause of an event that could possibly be
related to INFUSE (or just a result of cervical surgery). We agree it would
be very difficult to pin it on INFUSE, which is exactly why we wrote the
stopping rule that way. What we don't want is a rule that would have
specific events with incidence rates, etc., that would stop the trial when
it would be hard to say it WASN'T INFUSE. The way we wrote it, WE make the
determination whether it was INFUSE-related. This way, if a patient has an
AE like severe cervical swelling, we can honestly say that it is not
possible to know that the cause is definitely INFUSE and therefore the
study need not be stopped.

### Expert Testimony to the FDA Written By Medtronic

E-mails indicate that Medtronic drafted Dr. Hallet Mathew's presentation to the FDA Advisory Panel in January 2002. Dr. Mathews told the FDA Advisory Panel during his presentation, "I have no direct financial interest in the product under review here today and am not being paid for my participation in this meeting." [88] The implication of that narrowly crafted disclaimer is that Dr. Mathew's testimony was independent. However, an e-mail from December 2001 shows that Medtronic worked with the public relations firm Ketchum on preparing Mathew's speech. [89] Medtronic told the Committee that Mathews was not compensated for any activity undertaken in January 2002.[90] But Medtronic did pay Dr. Hal Mathews under consulting arrangements with the company in 2001 [91] and was hired by the company as the vice president of medical and clinical affairs in 2007.[92]

### Conclusion

The Committee's investigation discovered troubling evidence that Medtronic officials influenced the content of articles in peer-reviewed scientific publications to present InFuse in the best possible light. As physicians depend on peer-reviewed literature when making clinical decisions, biased articles in professional publications that downplay potential risks and exaggerate the benefits of a product have the potential to put patients' lives at risk. The Medicare and Medicaid programs also rely on peer-reviewed medical literature when determining covered benefits and services. While collaboration between study authors and industry is necessary to publish the results of clinical trials, as the data being presented is often controlled by the company that sponsored the research, the resulting articles must be untainted by industry bias.

[88] Transcript, FDA Advisory Panel, January 10, 2002, *http://www.fda.gov/ohrms/dockets/ ac/02/transcripts/3828t1.htm*.
[89] E-mail from Ketchum to Barry Lipscomb, December 11, 2001, MSD–R062111–077826.
[90] Correspondence between the Committee and Medtronic on June 22, 2012.
[91] *Id.*
[92] "Report: Medtronic lawyer filed whistleblower suit," Minneapolis Star Tribune, September 25, 2008.

19

In order to address the problem of biased research in medical literature, drug and device manufacturers and journal editors need to implement stringent disclosure policies that detail industry funding to physician authors. In addition, medical journals should follow the example of *The Spine Journal* and critically examine past studies that may exhibit industry bias that harms patients and misleads physicians. Further, in the event that company employees are involved in the drafting of a scientific article, the employee should be listed as an author. Medtronic's revised policies governing proper interactions with physician authors are a step in the right direction. However, it is unlikely that this problem is limited to one company and a handful of medical journals and doctors. Medical device manufacturers, pharmaceutical companies, and other health care stakeholders should ensure that they have transparency along with strict rules preventing improper interactions between their employees and study authors. Medical journals, if they are to remain credible, must aggressively require contributors to disclose all ties to industry and any assistance they received in preparing the manuscript.